IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

12 CV 0172

| | |
|---|---|
| NCSOFT CORPORATION and<br>NC INTERACTIVE, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| BLUEHOLE STUDIO, INC.<br>and EN MASSE ENTERTAINMENT, INC., | ) |
| | ) |
| Defendants. | ) |

C.A. No. _____  JAN 09 2012

U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR COPYRIGHT INFRINGEMENT, MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION, UNJUST ENRICHMENT, AND UNFAIR COMPETITION

This is a civil action by Plaintiffs NCsoft Corporation ("NCsoft") and NC Interactive, Inc. ("NCI") (collectively or individually referred to herein as, "Plaintiffs"), arising out of a massive scheme of unlawful misappropriation of Plaintiff's copyrighted works, trade secrets, and other confidential, proprietary information by Plaintiffs' direct competitors, defendants Bluehole Studio, Inc. ("Bluehole") and En Masse Entertainment, Inc. ("En Masse") (collectively, "Defendants"). NCsoft and NCI, by and through its undersigned counsel, allege as follows:

## NATURE OF THE ACTION

1. NCsoft is an established global leader in the development of innovative and highly sophisticated "massively multiplayer online role playing games" ("MMORPGs"), a genre of video games in which large numbers of players interact in real time through the Internet to cooperate and compete together in a virtual world.

2. Bluehole and its U.S. subsidiary, En Masse, are seeking to compete directly with NCsoft. They were founded and are controlled by a group of former NCsoft employees who, in

1

the midst of developing a new NCsoft MMORPG called "LINEAGE 3," quit the company in 2007 to go into business for themselves.

3.      These individuals did not leave NCsoft empty-handed or with benign intent.  To the contrary, they made off with copious amounts of confidential and proprietary NCsoft information, computer software, hardware, and artwork relating to LINEAGE 3.  Their business plan was simple and audacious:  create a competing product using the very work they had done while at NCsoft, launch it themselves to great fanfare and acclaim, and in the process, deal a crippling blow to their former employer.

4.      NCsoft did not sit idly by as its valuable assets were looted.  Rather, NCsoft immediately complained to the authorities in the Republic of Korea ("Korea"), and a police investigation began.  NCsoft also brought a civil action in Korea for damages and an injunction.

5.      In 2009, the former NCsoft employees were convicted by a Korean criminal court for the theft of valuable trade secrets from NCsoft.  Those convictions were upheld in significant part by the intermediate appellate court.  In 2010, a Korean civil court held these individuals, along with Bluehole, liable for misappropriation of trade secrets, awarded NCsoft damages, and issued an injunction preventing the former NCsoft employees and Bluehole from utilizing NCsoft's proprietary information on a going-forward basis.  The injunction was affirmed by the intermediate appellate court, although the award of damages was reversed.  The criminal convictions and civil judgment are now pending on appeal before Korea's highest court.

6.      Bluehole, meanwhile, proceeded with its development of a competing MMORPG called "TERA," and launched that game in Korea in 2011.  Despite the injunction imposed on Bluehole, TERA bears a telling resemblance to the planned LINEAGE 3, and it is evident that

Bluehole used proprietary NCsoft information that Bluehole's founders were determined by two courts to have stolen and that Bluehole was enjoined from using.

7.      Bluehole, continuing its competitive war against its rival, has now threatened to open a new and potentially enormous front, namely, the United States.  In particular, Bluehole recently announced plans to release an English-language version of TERA in the United States in the spring of 2012 through its U.S. subsidiary and co-defendant, En Masse.

8.      Based on what is now publicly available information regarding TERA, coupled with an analysis of the already-released Korean version of the game, it is evident that the U.S. version of TERA incorporates NCsoft's trade secrets, as well as NCsoft's copyrighted works.

9.      The launch of TERA in the United States is likely to cause immediate and irreparable harm to NCsoft.  Indeed, the marketing materials already released by the Defendants for the U.S. market reveal that they are aiming directly at NCsoft's customer base – and are doing so by emphasizing the very game features that they stole from NCsoft.  Once lost, that customer base would be extraordinarily difficult to replace.

10.     Accordingly, Plaintiffs bring this action seeking a preliminary and permanent injunction prohibiting Defendants from proceeding with the launch of TERA in the United States, or in the alternative, damages for the substantial harm that such a launch will inevitably cause NCsoft.  As set forth below, Plaintiffs assert claims for copyright infringement, trade secret misappropriation, breach of confidence, unfair competition, and unjust enrichment.

## PARTIES

11.     NCsoft Corporation is a corporation organized and existing under the laws of Korea, with a principal place of business at 158-16 NCsoft R&D Center B/D, Samsung-dong, Gangnam-gu, Seoul, 135-090, Korea.

12.     NC Interactive, Inc. is a corporation organized and existing under the laws of California, with a principal place of business at 1501 4th Avenue, Suite 2050, Seattle, WA 98101. NCI is a wholly owned subsidiary of NCsoft.

13.     Bluehole Studio, Inc. is a corporation organized and existing under the laws of Korea, with a principal place of business at 837-36 Yeoksam-dong, Gangnam-gu, Seoul, 135-937, Korea.

14.     En Masse Entertainment, Inc. is a corporation organized and existing under the laws of Washington, with a principal place of business at 1301 2nd Avenue, Suite 2550, Seattle, WA 98101. En Masse is a wholly owned subsidiary of Bluehole.

## NATURE OF SUIT AND JURISDICTION

15.     This is a civil action seeking damages and declaratory and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 et. seq., and for trade secret misappropriation, breach of confidence, unfair competition, and unjust enrichment under the laws of the state of New York.

16.     The Court has original jurisdiction over all claims in this Complaint under the Copyright Act pursuant to 28 U.S.C. §§ 1331 and 1338(a) & (b). The Court has supplemental jurisdiction over the state law claims in this Complaint pursuant to 28 U.S.C. § 1337(a).

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(d) and 28 U.S.C. § 1400(a). Plaintiffs do business in this judicial district. Defendants also do business in this judicial district, including by marketing, distributing and offering for sale products and services including TERA. Customers of Bluehole and En Masse, and users of Bluehole and En Masse products and services including TERA, reside in this judicial district.

## FACTUAL ALLEGATIONS

**A.      MMORPGs**

18.     The genre of video games at issue in this case, MMORPGs, is one of the most complex categories of products in the entertainment industry and, indeed, is among the more complex computer applications of any kind.  In an MMORPG, hundreds or even thousands of players may be simultaneously playing a game, interacting both cooperatively and as adversaries in a virtually infinite number of ever-shifting combinations.  In typical MMORPGs, each player selects an avatar as his or her own from a menu of characters and controls that character's behavior within a set of rules and parameters in order to achieve the game's objectives.  The virtual world of the game, which is typically hosted on massive central servers maintained by the game's publisher, continues to exist and change while the player is offline, away from the game, and others are playing.

19.     Developing and launching an MMORPG is a very costly, time-consuming, and labor-intensive undertaking.  Typically, it takes millions of dollars, years of research and development work, large teams of programmers, graphic artists and authors to develop and launch a new MMORPG.  Obviously, misappropriating another developer's work-in-process can substantially reduce the cost and time entailed in the development of an MMORPG.

20.     Once an MMORPG is launched, it is marketed to players who purchase the game software, in-game virtual items, and/or pay a monthly subscription fee to access game servers or a one time fee to purchase in-game virtual items.  Player loyalty develops with these games, and successful developers achieve a continuous revenue stream over a number of years by operating these games, introducing new content, and/or introducing sequels.

**B.     NCsoft Became A Worldwide Leader in Online Video Games With Its Innovative and Proprietary MMORPG Games, LINEAGE and LINEAGE 2**

21.     NCsoft Corporation, a Korean company formed in 1997, has quickly grown to become one of the leading online video gaming companies in the world.  NC Interactive is a wholly-owned United States subsidiary formed in 2000 to service NCsoft customers in the United States.

22.     NCsoft's first product, LINEAGE ("L1"), was introduced in 1998.  NCsoft invested substantial resources to develop the technology for L1 -- the first MMORPG game produced in Korea.  L1 embodied many ground-breaking innovations in video gaming and attracted millions of users, first in Korea and then throughout the United States, Europe, and Asia.

23.     In 2003, NCsoft introduced LINEAGE 2 ("L2"), the next installment in the LINEAGE series.  Like L1, L2 embodied important advances in the art of video gaming.  In significant part, these advances resulted from substantial work done by NCsoft's engineers to modify and improve a pre-existing off-the-shelf "game engine" which includes the basic platform for a game, but must be customized for every specific product.  NCsoft did so for L2, including by creating beautiful and realistic graphical effects for the game.  This pioneering customization of the game engine has enabled NCsoft to revolutionize the field of MMORPGs with the use of 3D graphics and enhanced realism.

24.     A signature feature of the LINEAGE franchise is known as "Castle Siege."  In this mode of game play, groups of players can periodically battle for control of a castle.  The player group that successfully attacks or defends the castle is rewarded with political and economic control over the territory in which the castle is located.  Hundreds of players may gather in a small area at the same time to participate in the battle.

25.    As with L1, NCsoft devoted significant resources, not only to the technical development of L2, but also to its global marketing. L2, like its predecessor, L1, has achieved tremendous sales and success. Within two years from the launch of L2, LINEAGE 1 and 2 made up 50% of NCsoft's total worldwide revenue. As of 2011, there are 41 million registered worldwide users of these two games and cumulative revenues on the order of $2.1 billion.

**C.     The Development of LINEAGE 3**

26.    In 2005, NCsoft began development of LINEAGE 3 ("L3"), the next installment in the LINEAGE series. Based on the success of L1 and L2, and seeking to keep the LINEAGE franchise fresh, and in turn, expand the installed base of LINEAGE customers, NCsoft devoted extensive resources to the development process. Over the next 16 months, NCsoft dedicated a team of more than 100 designers and programmers and spent approximately $6.5 million out of the $25 million total budgeted for the development of LINEAGE 3.

27.    The development of L3 was led by Mr. Yong-Hyun Park, an NCsoft engineer who had been with the company since 2000 and who had also had a key role in the development of L2. By February 2007, market research had been conducted, NCsoft's graphic artists had produced copyrighted concept art for potential player-controlled characters, non-player characters and monsters, and the world environment (*e.g.*, continents and cities); the physical specifications (*e.g.*, size, general body type) for the playable characters had been determined; and software programmers had developed key game-play features for L3.

28.    **Playable Characters and Other Visual Features.**  Like other MMORPGs, including L1 and L2, LINEAGE 3 was to feature a variety of types or "races," as they are called in the gaming world. While the playable characters created for L3 were based, to some extent, on the family of characters developed by NCsoft for L2, L3 was in a position to feature a lineup that

was novel and unique to that game, consisting of a set of races with distinct specific body types,

relative sizes, and unique physical features (*e.g.*, horns or animal features):



Although all of the characters were visually distinctive and appealing, the two left-most

characters – the child-like female fairy heroine and the small, rotund and furry animal-like race –

were of a type that was completely different from any characters previously appearing in an

MMORPG.

29.    NCsoft's development work on the characters for LINEAGE 3 was not limited to

concept art.  By the end of 2006, NCsoft had also determined how these characters would be

technically implemented, including, e.g., the number of polygons that would be rendered,

textures, bone structures, body types and relative sizes.

30.    NCsoft also planned a distinctive geographical layout for the virtual world of L3,

consisting of four continents surrounding a central island.  NCsoft graphical designers created

the following map of the L3 virtual world:



31.    NCsoft also planned for L3 to feature unusually large monsters that players could combat alone or in groups.

32.    Finally, the L3 geography included a feature carried forward from L1 and L2, namely, capital cities built on hills around a central tower.

33.    **Additional Game Features.**  The unique and innovative nature of L3 did not end with its storyline or the look and feel of the characters and environment.  Seeking to build and improve on the L1 and L2 game play, the L3 team conceived of and developed two radical and unique features.

34.    First, the L3 team sought to create a more dynamic and engaging system for combat.  While L1 and L2 used traditional click-to-target attacks that are relatively static, the L3 team created what it called an "Action Combat" system.  Not only would the new combat system be an improvement over L1 and L2, but NCsoft's market research showed that it could appeal to a new player demographic.

35.    As the name implies, the Action Combat system was more dynamic, emphasizing reaction times and requiring that players:  (1) actively target specific portions of the monster for attack, rather than target the monster generally, (2) constantly be on the move around monsters

rather than just run up and attack, (3) control the distance between themselves and the monster, and (4) control the timing between attacks on the same monster. The reaction pattern of the monster, such as the monster being knocked back or down, also contributes to the dynamic and realistic nature of combat in L3.

36.    Second, the L3 team sought to expand upon the Castle Siege game play of L1 and L2 by adding a true political system that allows a player to become a ruler through election, as an alternative to the traditional method of combat. The ruler would have access to special abilities and privileges, including the power to tax, enable combat within a zone, open shops, and offer new skills. The ruler also had the ability to put other players in prison. NCsoft designed this political system to enhance communication between players and to strengthen the player community.

37.    **Game Editor.** For L2, NCsoft licensed a third-party graphical rendering engine from Epic Games, Inc. ("Epic"). NCsoft invested substantial time and effort developing technology to customize Epic's "Unreal" engine in order to produce the desired graphical and visual elements of the game. Much of the success of the prior LINEAGE products is due to NCsoft's technical innovations.

38.    For LINEAGE 3, NCsoft sought to continue its tradition of developing technical innovations for improving the visual and graphical aspects of the LINEAGE series of products. In 2006, NCsoft licensed the next generation product from Epic, the Unreal Engine 3. NCsoft then utilized more than 100 employees and spent more than $5 million to customize the engine and produce the desired graphical effects.

39.    The graphical improvements NCsoft developed for LINEAGE 3 included:

- Ambient occlusion technology that takes into account when a light source may be blocked by an object;

- Terrain editing functions that take into account the slope of the underlying terrain when rendering an object (e.g., the angle of a character's feet);
- Material templates that allow for improved textures and movements of materials like clothing; and
- Light probe technology that improves color.

40.     By the end of 2006, NCsoft had also developed the computer resource files that would be needed to run the current version of the game.  The resources include the files necessary for rending characters and their associated clothing, monsters, world maps and special effects.  All of NCsoft's combined efforts in this regard resulted in the "L3 Editor."

**D.     NCsoft Vigorously Protected Its Confidential and Proprietary Information**

41.     At all times relevant to this action, NCsoft has vigorously sought to protect its confidential, proprietary, and trade secret information using an array of measures.

42.     Among other measures, NCsoft required that all employees involved in the L3 project sign non-disclosure and other confidentiality agreements.  By these agreements, employees agreed not to retain, disclose, or use any NCsoft proprietary information, and/or trade secret information upon conclusion of their employment with NCsoft.  These agreements included a Consent to Security Management and Supervision and Instruction agreement ("Security Consent Agreement") and an Information Security and Supervisory Agreement and Ethical Guidelines ("Ethical Guidelines Agreement").

43.     The Security Consent Agreement states that an employee shall keep in confidence, both during and after employment at NCsoft, "any and all confidential information or material" that includes:

> a) Information in connection with game development, including but not limited to R&D planning, the contents of task reports and/or job sheets, experimental data and research achievement analysis data;

b) Technical information, including but not limited to planning and design methods, drawings, design processes, design equipment and computer programs in connection with game production;

c) The privacy of the customer and all data, the analysis data thereof and any kind of report with respect to such privacy;

d) Management information, including personal affairs, organization and financial management secrets;

e) Any and all data or information arising from or collected by the Company or through its affiliates' activities, or all data and/or information used during such activities, in connection with the present or prospective business of the Company or its affiliates;

f) Any and all data or information that results from or is suggested by any work I do or through tasks allocated to me;

g) Any and all data or information not generally known to the public that results from my proposal for or on behalf of the Company, or through tasks allocated to me or work performed by me;

h) Any and all data or information other than the above a) to g) that is treated, or is determined to be treated expressly or implicitly, directly or indirectly as "confidential."

44.   The Ethical Guidelines Agreement similarly states that:

employees who possess technical secrets and business secrets as well as important sales data acquired in the process of developing the LINEAGE 3 game should not arbitrarily disclose the above information outside of the company or use the above information while working for the company and should return, delete, or dispose of related business secrets or major sales assets when leaving the company.

45.   Employees also agreed "not to set up, move to, or collaborate with any competing company (or a partnership therewith) in cases where the employee used any proprietary information of NCsoft." The Security Consent Agreement likewise states that the employee will not "[e]stablish a competing company or conduct business in partnership using trade secrets, etc., or use trade secrets, etc., in any other manner."

46.     Each of the L3 Team executed employment and confidentiality agreements with NCsoft.  Each of the L3 Team executed the Ethical Guidelines Agreement, the Security Consent Agreement and a Separation Agreement.

47.     In addition to these agreements, NCsoft provided educational and training programs directed to ensuring that employees understood their confidentiality obligations.  Each of the L3 Team attended programs at NCsoft regarding confidentiality.

48.     Moreover, upon departure from NCsoft, all employees also had to certify by executing a Separation Agreement that they were not in possession of any NCsoft proprietary information and would continue to preserve the confidentiality of NCsoft trade secrets.  A departing employee also specifically agreed that he or she would "not encourage, induce or incite other employees of the Company to leave the Company, transfer to another company of any kind or establish another company by requesting to work together, or by introducing them to a competing company."  Each of the L3 Team certified that he did not possess, and would continue to preserve the confidentiality of, any NCsoft proprietary information at the time he left NCsoft for Bluehole.

49.     NCsoft additionally used technical measures to safeguard the proprietary information related to L3.  NCsoft limited access to those NCsoft employees who needed the information to perform their assigned duties, and even established a separate, dedicated computer network for materials related to the development of L3.  Employees were also prohibited from transferring computer files from their office computers to personal storage devices (*e.g.*, flash drives and external hard drives).

**E.     The Conception and Formation of Defendant Bluehole**

50.     Throughout the development of LINEAGE 3, Yong-Hyun Park ("Park"), the head of the project, repeatedly expressed to company management dissatisfaction with his

compensation.  Although he was already one of the highest paid employees of the company, Park was of the opinion that he should receive additional salary as well as an equity interest in the future profits from L3.  NCsoft management disagreed, believing that Park's compensation was already generous by comparison with his peers both at NCsoft and at competing Korean video-game companies.

51.     Unsatisfied with that response, Park began secret discussions with other key managers from the L2 and L3 teams about leaving NCsoft, forming a new video-game company, luring away the L3 development team, and using NCsoft's proprietary information to complete and launch, in effect, the same game they had been developing at NCsoft, while reaping a greater share of the profits for themselves.  Park and the other managers entered into negotiations with potential third-party investors, to whom they disclosed NCsoft proprietary information about L3. After first failing to secure investment from a major Japanese competitor, the conspirators obtained backing from a wealthy individual.

52.     The conspirators also were busy persuading many other L3 team members to resign collectively and join them in a new Korean game development company -- an event referred to by Park as "D-day."  To that end, they went so far as holding a meeting in a conference room of NCsoft to entice employees to join with them.  Soon after, NCsoft became aware of this event and swiftly discharged Park and the other managers from their roles.

53.     By that time, however, the damage was done.  By March 2007, the efforts of Park and others proved successful – 48 of the more than 100 L3 team members left NCsoft to join the newly-formed Bluehole.  These individuals were selected based on their level of knowledge and information related to the L3 project and included game designers, programmers, and graphic

artists.  They were lured to Bluehole with attractive compensation packages that had been put together using confidential payroll and other personnel information taken from NCsoft.

54.    But the theft of proprietary information did not end there.  As set forth in detail below, before departing NCsoft, Park and the other former managers and L3 team members systematically stole substantial additional quantities of valuable NCsoft technical trade secrets and other proprietary information related to the L3 game itself.  Around the same time, NCsoft discovered the concerted theft through its internal investigations.

### F.    The Criminal Convictions and Civil Injunction in Korea

55.    In light of NCsoft's discovery of the actions of its former employees, the Korean government instituted criminal proceedings against Park and other former NCsoft employees, who were indicted for trade secret misappropriation, unfair competition, and breach of trust.  The misappropriation was confirmed by review of computers impounded from Bluehole and police interrogations of the former employees.  Park and three others were convicted and either fined or sentenced to prison terms.  The criminal judgment was affirmed by an intermediate appellate court and is now on review by Korea's highest court.

56.    While the police investigation was still ongoing, NCsoft filed a civil lawsuit in Korea against Park, ten other ex-NCsoft employees, and Bluehole in August 2008.  In February 2010, the civil court agreed that the defendants had misappropriated trade secrets protected under Korean law.  The court did not, however, consider or rule on whether the defendants had incorporated the stolen trade secrets in an actual video game, because Bluehole had not yet released TERA (or any other product) at the time of the judgment.  For the same reason, NCsoft was not in any position to assert, and the court had no opportunity to consider, any claim of infringement of NCsoft copyrights.

57.     The court awarded NCsoft damages of approximately two million dollars.  The court also permanently enjoined Bluehole from acquiring, disclosing, and using NCsoft's trade secrets and ordered them to destroy the stolen files.  Although the monetary award was reversed by an intermediate appellate court, the injunction was affirmed.  The civil judgment is now on appeal to Korea's highest court.

58.     During both the criminal and civil proceedings, the courts made extensive factual findings, including that NCsoft's LINEAGE products enjoyed great success; that NCsoft had made a substantial investment in the development of L3; and that NCsoft had taken the necessary security measures to protect all proprietary information developed during the L3 project.  The courts also made findings regarding the key roles of the various employees with respect to the development of the LINEAGE products; the process to entice investors; and the well-orchestrated mass exodus from NCsoft.  The courts further determined that Park and the former NCsoft employees stole and transferred an extensive amount of proprietary data to, among other things, personal storage devices, such as flash drives, before leaving NCsoft.

59.     The stolen information included, but was not limited to, the following general categories:  (1) the planning, concept, and features of L3; (2) the technical design, graphics,  and specifications of the featured L3 characters; (3) concepts and software files related to the game features including the dynamic combat system, the political and economic systems, and the capital city; (4) software files related to game execution; (5) customized files for the Unreal 3 game engine; (6) improvements to the graphics process; and (7) other general planning and budget related documents.  Additionally, the civil judgment included a listing of four pages of computer file names that were specifically found to have been in Bluehole's or its employees' possession.

60.     The courts also found that Bluehole had even set up a task force for recovering the documents and other information that were stolen from NCsoft. Bluehole created separate computer files for the recovery process and focused on recovering the key documents related to the development of L3. As part of the recovery process, Bluehole reproduced the documents relating to the technical design of the characters along with other innovative features of L3 and made these available to all employees for their reference. By virtue of the theft and recovery, an internal Bluehole memo touted that it would be able to develop its L3-based MMORPG in half the time that had been scheduled for L3.

61.     During the police interrogations, many of the employees initially denied that they had unlawfully taken NCsoft's proprietary information for use at Bluehole. But once confronted with evidence of NCsoft files on their computers, the employees admitted to taking them, and some even admitted that they intended to use the information. In an attempt to conceal the theft, Park and the other former employees claimed that they discarded or "lost" personal storage devices that had been used for the transfer of the files. Moreover, they used programs specially designed to delete files permanently from their computers at NCsoft in an effort to prevent the Korean police and prosecution from conducting forensic inspection of their computers.

62.     Finally, the Korean courts found that the information misappropriated by the defendants provided them with a competitive advantage and value, which stemmed from the significant amount of time, effort, and money invested by NCsoft in developing LINEAGE 3.

**G.     TERA**

63.     Throughout the Korean criminal and civil proceedings, Bluehole continued work on its planned video game. On January 25, 2011, Bluehole officially launched TERA in Korea. As set forth in further detail below, the Korean version of TERA includes many of L3's unique and innovative game features, including the lineup of playable characters, the game geography,

the "action combat" system, and the political system.  Based on the Korean version of TERA, it is highly likely that, despite the injunction, Bluehole incorporated NCsoft's proprietary information and trade secrets, as well as copyrighted works, into the Korean version of TERA.

64.     Due to the pendency of the appeals in the Korean criminal and civil actions, NCsoft, as a practical matter, must defer seeking further remedies from Bluehole arising out of the Korean version of TERA.  Bluehole has now announced that it will launch a version of TERA in the United States sometime in Spring 2012, using En Masse as the publisher.  En Masse is a U.S.-based wholly-owned subsidiary of Bluehole that was formed in 2010 for this specific purpose.   The founding members of the En Masse executive team, Jae-Heon Yang, Pat Wyatt, Chris Lee and Brian Knox, were all former NCsoft employees.

65.     During the past year, Defendants began previewing the U.S. version of TERA for customers.  Among other things, Defendants publicized and provided preview versions of TERA in trade shows in the U.S., conducted for testing purposes a "Community Play Event" for a selected group of U.S. players in March 2011, and set up at least one server in the United States with plans on setting up additional servers across the various regions.

66.     In the June 2011 Electronic Entertainment Expo ("E3"), En Masse previewed TERA with a booth designed after one of the capital cities in the TERA world and ten play kiosks.  The recent statements and interviews of Bluehole and En Masse at E3 and elsewhere, as well as the information now featured on the TERA website, make it clear that Defendants are close to launching TERA in the United States, with a version that is nearly identical to the Korean version in critical respects.

67.     These previews and information have allowed NCsoft to evaluate, to the extent possible before actual release of the game and in the absence of discovery, whether the U.S.

version, like its Korean precursor, will incorporate NCsoft's proprietary information and infringe NCsoft's copyrights.  The answer is a clear "yes."

68.    **Playable Characters and Other Visual Elements.**  The seven featured playable characters in the U.S. version of TERA are substantially similar to the L3 characters that were developed by NCsoft.  These characters – Elin, Popori, Baraka, Castanics, Amani, Humans, and High Elves – are substantially similar in look and feel to the characters designed specifically for L3, including with respect to features, age, body type, and height differentiation:



69.    Even among the individual characters, there are physical similarities beyond body type and relative sizes that evidence copying.  For example, the TERA Castanics race includes the horns conceived by the L3 team:

| NCSOFT (LINEAGE 3) | BLUEHOLE (TERA) |
|---|---|
|  | |

70.     Notably, the TERA races include the two L3 races that were of a type that had never been utilized before.  First, TERA has copied a small, rotund and furry animal-like race created for L3:

| NCSOFT (LINEAGE 3) | BLUEHOLE (TERA) |
|---|---|
| | |

71.     Likewise, TERA's Elin character is remarkably similar to the child-like fairy heroine developed by NCsoft:

| NCSOFT (LINEAGE 3) | BLUEHOLE (TERA) |
|---|---|
|  | |

72.     While it is possible for a user to vary the characters within the races some while game playing  (a user can select one of eight classes for each race), default images for each of the

characters still appear very similar to the L3 characters in total look and feel and, indeed, have been used in TERA marketing materials.

73.     Similarly, the U.S. version of TERA featured other visual and conceptual elements that are substantially similar to the ones in L3, such as the virtual world, large monsters, and capital cities.  Both virtual worlds consist of a ring of four continents, situated at each corner of the world and arrayed around a central body of water, in the middle of which there is an island.  Further, each continent in the virtual world of TERA has a particular geographical trait and a capital city that are conceptually similar to the ones in the continents of the L3 world.

74.     **Game Features and Game Editor.**  The U.S. version of TERA, like the Korean version, also includes L3's two most significant game innovations, the "action combat" and the political system described above.  Specifically, TERA offers its own "action combat" system (thus using even the name developed by NCsoft), incorporating a free-targeting system, which enables users to hit where they aim, to react in real-time by dodging out of the way when attacked, and to control timing and placement of characters and their actions.

75.     Likewise, TERA incorporates the political system developed for LINEAGE 3, including the precise features that were planned for L3:  "getting votes, buying votes, smearing your opponents, taking out your competition, raising taxes, making tons of cash money, controlling your province, putting players in prison, running your own events, managing your own towns and just doing whatever you want."

76.     In addition, the U.S. version of TERA uses the same game engine – "Unreal Engine 3" – that NCsoft had licensed for use in developing L3.  While the selection of a commercially available game engine would not, by itself, constitute unlawful conduct, TERA

appears to incorporate a number of the proprietary modifications and improvements to the game engine that had been developed by the NCsoft team.

77.     These include the rendering of the characters' ankles in a manner that is spatially aligned with given angles in the game terrain and the rendering of garment movement in a manner that is aligned with the characters' movement.  Although these graphical improvements may sound relatively minor, they are, in fact, technologically difficult and unique advances in the art of video gaming, for which NCsoft invested substantial resources to develop.

78.     Defendants have been heavily marketing the very features that NCsoft researched and developed for L3.  For example, the U.S. website for TERA features the L3 action combat system, stating that "True Action Combat isn't just a marketing buzzword, *it's a redefinition of gaming*.  If you think you know how to play an online RPG, you haven't played TERA yet." http://www.tera-online.com/content/redefining-party-tera (emphasis added).  Brian Knox, former NCsoft game producer and current producer for En Masse, stated in an interview that the action combat system is a "pillar" of TERA:  "We always try to talk about *certain pillars of the game*, what are we better at, what are we different at.  *The action combat is by far one of those*, and of course we've talked, and talked, and talked about it…"  http://www.terapvp.com/threads/gdc-2011-brian-knox-interview.873/ (emphasis added).

79.     As for the L3 political system found in TERA, Defendants have been even more effusive, stating that the political system is a "*never before seen, ground-breaking feature* of TERA".  Transcript of http://e3.gamespot.com/video/6320861/tera-e3-2011-demo-video. Indeed, in community polls sponsored by En Masse on the Official TERA Forums, 42.65% of the responding player base cited "Action-Combat" system as the feature that "caught your eye" (http://www.tera-online.com/forums/showthread.php?t=16144 ) and 68.71% of the responding

player base stated that the political system "will be awesome!!!!" (http://www.tera-online.com/forums/showthread.php?t=9574).

80.     Players who participated in the March beta test have also independently observed similarities between TERA and NCsoft's LINEAGE franchise.  Some comments include:

- "What actually drew me to the game was the fact that my favorite game in recent years has been Lineage II, and the fact that this game was created from many of the developers who left the creating of lineage 3 (and "allegedly" [sic] stole coding) told me that it would be similar in style... The open pvp is a requirement of mine, as faction based games are deal breakers for me."

- "First thing to catch my eye was the graphics. Then the combat. The second video I watched showed off the outfits and I was beyond hooked. The progression of games coming out of Korea leaves me in awe...Lineage 2 --> Aion → TERA."

The reference to "Aion" in the latter quotation is to another NCsoft product.

81.     Statements demonstrating the incorporation of L3 features into TERA  -- and the significance of these features to players -- have even been made by former NCsoft team members that left for Bluehole.  For example, Mr. C. Hwang, one of the former NCsoft employees indicted in Korea, stated in an interview regarding the release of TERA in the U.S.:

Creators of Tera were already tired of the old, almost always the same mmo combat systems, that's why their priority was to create free target system. That was also one of the biggest challenges, because such a system needs much better communication with server and causes a lot of caveat for programmers. *But they managed to solve all of that, thanks to, guess what? - lots of work.*

Most of the games made with Unreal Engine 3 are dark or gray, or dark and gray, so most vivid colors of Tera seem a little bit surprising. Tools of Unreal Engine let artists achieve whole spectrum of looks and feels, that is only the question of craftsmanship and imagination, and of course, a lot of work. Some might wonder why BHS decided to use UE3 in the first place. *When you consider that the team had 10 years of experience with previous versions of UE and ease with what you can implement changes to that engine the answer seem trivial.*

http://www.tera-affiliates.com/?p=377 (emphasis added).  The "lots of work" and "10 years of experience" cannot refer to the newly-formed Bluehole or En Masse.  Rather they are clear references to the millions of dollars and thousands of man-hours invested by NCsoft to develop the LINEAGE franchise and L3 in particular.

82.     Since the release of TERA in Korea, NCsoft's LINEAGE sales and market share in Korea have declined, as have sales and market share of other NCsoft products.  The same effect can reasonably be anticipated in this country following the launch of the U.S. version of TERA, along with lost customer loyalty – a harm that cannot easily be quantified.

83.     Bluehole unquestionably used NCsoft's copyrighted and trade secret information to develop TERA.  It appears beyond doubt that Bluehole and En Masse are now also using NCsoft's copyrighted and trade secret information in its previews of TERA in the United States and will continue to do after TERA is commercially released in the United States.  Further, Bluehole and En Masse have been unjustly enriched at NCsoft's expense.  These actions are unlawful, cause irreparable harm to NCsoft and NCI, and should be remedied pursuant to law.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (COPYRIGHT INFRINGEMENT)

84.     Plaintiffs reallege and incorporate paragraphs 1-83 above.

85.     Plaintiffs have a valid and enforceable copyright in the original works it created during the research, development, publication and maintenance of its products, including LINEAGE 3.

86.     Defendants have, without permission, consent or authorization from Plaintiffs, copied, prepared, reproduced and distributed NCsoft's copyrighted materials, including concept art created for LINEAGE 3.

87.     Defendants have, without permission, consent or authorization from Plaintiffs, created derivative works from NCsoft's copyrighted materials, including concept art created for LINEAGE 3.

88.     Defendants' unauthorized conduct constitutes infringement of Plaintiffs' copyrights.  Defendants will further infringe if and when TERA is released in the United States.

89.     Defendants' acts of infringement are deliberate, willful, and in bad faith, with full knowledge and conscious disregard for Plaintiffs' exclusive copyrights.

## SECOND CLAIM FOR RELIEF
## (TRADE SECRET MISAPPROPRIATION)

90.     Plaintiffs reallege and incorporate paragraphs 1-83 above.

91.     Plaintiffs possessed confidential and trade secret information, including documents, source code, artwork and know-how, relating to the research and development of its products, including LINEAGE 3.  Plaintiffs' trade secret information was not generally known in the industry, was not generally known by Plaintiffs' own employees who did not require access to such information during the course of their everyday duties, was reasonably protected by Plaintiffs, is valuable to Plaintiffs' and Defendants' businesses, was the product of significant effort and expense, and is not easily acquired or duplicated.

92.     Defendants have misused Plaintiffs' confidential and trade secret information, including documents, source code, artwork and know-how, in breach of confidentiality obligations and/or as a result of discovery by improper means by the development, marketing, distribution and maintenance of TERA.  Defendants will further misuse Plaintiff's confidential and trade secret information in the future if and when TERA is released in the United States.

93.     Plaintiffs have suffered and will continue to suffer injury resulting from Defendants' misconduct.

94.     Defendants' unauthorized conduct constitutes misappropriation of Plaintiffs' trade secrets.

## THIRD CLAIM FOR RELIEF
## (BREACH OF CONFIDENCE)

95.     Plaintiffs reallege and incorporated paragraphs 1-83 above.

96.     Plaintiffs possessed confidential and proprietary information relating to the research, development and distribution of its products, including LINEAGE 3.  Plaintiffs' proprietary information was not generally known in the industry, was not generally known by Plaintiffs' own employees who did not require access to such information during the course of their everyday activities, was reasonably protected by Plaintiffs, is valuable to Plaintiffs' and Defendants' business, was the product of significant effort and expense, and is not easily acquired or duplicated.

97.     Defendants have misused Plaintiffs' confidential and proprietary information in breach of confidentiality obligations and/or as a result of discovery by improper means by the development, marketing, distribution and maintenance of TERA, including in the United States. Defendants will further misuse Plaintiff's confidential and proprietary information in the future if and when TERA is released in the United States.

98.     Defendants' unauthorized conduct constitutes breach of confidence.

## FOURTH CLAIM FOR RELIEF
## (UNFAIR COMPETITION)

99.     Plaintiffs reallege and incorporated paragraphs 1-83 above.

100.    Plaintiffs possessed confidential, proprietary and trade secret information relating to the research and development of its products, including LINEAGE 3.

101.    Defendants have misused Plaintiffs' confidential, proprietary and trade secret information in breach of confidentiality obligations and/or as a result of discovery by improper means by the development, marketing, distribution and maintenance of TERA, and are unfairly competing with Plaintiffs in the United States.

102.    Defendants' conduct constitutes unfair competition.

## FIFTH CLAIM FOR RELIEF
## (UNJUST ENRICHMENT)

103.    Plaintiffs reallege and incorporated paragraphs 1-83 above.

104.    Defendants have been enriched by the taking, copying and misuse of Plaintiffs' proprietary information and technology, including the research and development work for Lineage 3.

105.    Defendants' enrichment was at Plaintiffs' expense.

106.    Under the circumstances equity and good conscience dictate that Defendants should pay restitution to Plaintiffs.

107.    Defendants have been unjustly enriched.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs prays that the Court:

(1)  Determine and declare that Defendants infringe Plaintiffs' copyrights.

(2)  Determine and declare Defendants misused Plaintiffs' proprietary and trade secret information.

(3)  Determine and declare that Defendants have unfairly competed with Plaintiffs.

(4)  Determine and declare that Defendants have been unjustly enriched.

(5)  Issue temporary, preliminary and permanent injunctions that prevent Defendants from obtaining, accessing, using, retaining, distributing or disclosing NCsoft's proprietary information and documents, including by enjoining the launch of TERA in the United States.

(6)  Order disclosure and return of all NCsoft proprietary information to Plaintiffs.

(7)  Order damages resulting from Defendants' knowing and willful misconduct, including an accounting to determine Defendants' profits resulting from their unlawful activities and awarding such profits be paid to Plaintiffs.

(8)  Order enhancement of damages resulting from Defendants' knowing and willful misconduct as the Court may deem just and proper under the circumstances.

(9)  Award Plaintiffs' their reasonable attorneys' fees and costs incurred in this litigation.

(10)  Award Plaintiffs any pre- or post- judgment interest according to law.

(11)  Order any other or further relief as the Court may deem just and proper under the circumstances.

Dated:  January 9, 2012

ROPES & GRAY LLP

By: _____

Gene W. Lee (GL9386)
Jeanne C. Curtis (JC4673)
1211 Avenue of the Americas
New York, NY 10036
(t) 212-596-9404
(f) 212-596-9500
gene.lee@ropesgray.com
jeanne.curtis@ropesgray.com

Peter J. Brody
One Metro Center
700 12th Street, NW
Suite 900
Washington, DC 20005-3948
(t) 202-508-4600
(f) 202-508-4650
peter.brody@ropesgray.com

Attorneys for NCsoft Corporation
and NC Interactive, Inc.